## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,

                       Plaintiff,

          v.

CURTIS COOPER,

                   Defendant.

Criminal Action No. 23-004

---

Michael F. McTaggart, U.S. ATTORNEY'S OFFICE, Wilmington, Delaware.

       *Counsel for Plaintiff*

Eleni Kousoulis, Janet Bateman, PUBLIC FEDERAL DEFENDER'S OFFICE, Wilmington, Delaware.

       *Counsel for Defendant*

## **MEMORANDUM OPINION**

November 27, 2023
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Presently before this Court is Defendant Curtis Cooper's ("Cooper" or "Defendant") Motion to Dismiss an Indictment, D.I. 29, charging Cooper with Possession of a Firearm by a Felon, in violation of 18 U.S.C. § 922(g)(1) ("Section 922(g)(1)") and Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C). Defendant contends that § 922(g)(1) is unconstitutional both on its face and as applies to him under recent Supreme Court and Third Circuit authority. The Government opposes Defendant's Motion. D.I. 32; D.I. 34. For the reasons set forth below, Defendant's Motion is denied in all respects.

## I. BACKGROUND

Following his arrest on October 5, 2022, Defendant Cooper was charged pursuant to a two-count indictment (the "Indictment"). D.I. 18. Under Count One, Defendant is charged with Possession of a Firearm by a Felon, in violation of § 922(g)(1). D.I. 18 at 1-2. Count Two of the Indictment charges Defendant with Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C). *Id.*

This is not Cooper's first interaction with the criminal justice system nor is it Cooper's first drug-related offense. D.I. 32 at 17. Indeed, the instant offense occurred while Cooper was on State of Delaware supervised probation. *Id.* Defendant's prior convictions include a 2014 felony conviction for Drug Dealing under 16 Del. C. § 4754, a 2017 felony conviction of Drug Dealing Heroin under 16 Del. C. § 4754, and a 2021 conviction on charges of Possession of Heroin, Aggravated Possession of Heroin, and Resisting Arrest. *Id.* at 4-5.

Defendant files the present Motion to Dismiss challenging the constitutionality of § 922(g)(1) on grounds that the statute is unconstitutional both on its face and as applied to Cooper following the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*") and the Third Circuit's decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) ("*Range*"). D.I. 29.

## II.   LEGAL STANDARD

The Second Amendment of the United States Constitution holds that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. However, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *D.C. v. Heller*, 554 U.S. 570, 626 (2008). As the Supreme Court recognized in *Heller*, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* The *Heller* Court recognized, for instance, the longstanding prohibitions on the possession of firearms by felons. *Id.* at 570; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' ... *We repeat those assurances here*.") (emphasis added) (citation omitted).

Recently, the Supreme Court revisited its Second Amendment jurisprudence in *Bruen*. 142 S. Ct. 2111. In *Bruen*, the Court considered a constitutional challenge to a New York State licensing scheme that criminalized the possession of "'any firearm' without a license, whether inside or outside the home." *Id.* at 2123 (citation omitted). Under the statute, an individual seeking a license to carry a firearm outside of his home or place of business for self-defense was required

to prove that "proper cause existed to issue the license." *Id.* New York courts found "proper cause" was demonstrated only where an applicant could show "a special need for self-protection distinguishable from that of the general community." *Id.* Petitioners were two New York citizens who were denied licenses to carry firearms outside of their homes for self-defense. In both instances, petitioners were denied licenses after failing to show "proper cause, *i.e.*, . . . demonstrate a unique need for self-defense." *Id.* at 2125.

In ruling on the issue, the Supreme Court recognized that, following its prior holdings *Heller* and *McDonald*, the Courts of Appeals adopted a two-step framework for analyzing Second Amendment challenges. *Id.* at 2125-26. Under the first step of this analysis, the so-called historical evidence step, the government was required to prove that its firearms regulation "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. If the regulated conduct fell beyond the Second Amendment's historical and original scope, the activity was not protected, and the analysis ended there. *Id.* at 2126. If, however, "historical evidence at this step is inconclusive or suggests that the regulated activity is not categorically unprotected, the courts generally proceed to step two," which analyzes "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.*

The Supreme Court in *Bruen* rejected this two-step analysis, finding that it was "one step too many." *Id.* at 2127. According to the Court, "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* Thus, the Court found that, when it is determined that the Second Amendment's plain language protects an individual and his conduct, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits

4

the outer bounds of the right to keep and bear arms." *Id.* at 2127, 2131. While recognizing that this historical approach can be difficult in circumstances that raise "unprecedented societal concerns or dramatic technological changes," the Court explained that courts could conduct their analysis using analogical reasoning and "determin[e] whether a historical regulation is a proper analogue for a distinctly modern firearm regulation . . . ." *Id.* at 2132. According to the Court, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin. Id.* (emphasis in original). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

Shortly after *Bruen*, the Third Circuit in *Range* considered the constitutionality of § 922(g)(1) as it applied to Appellant Brian Range, who had been convicted of making a false statement to obtain food stamps in violation of Pennsylvania law in 1995. 69 F.4th at 101. Range sought a declaration from the United States District Court for the Eastern District of Pennsylvania that § 922(g)(1) violates the Second Amendment as applied to him. *Id.* at 99.

Applying the Supreme Court's *Bruen* decision, the Third Circuit agreed that § 922(g)(1) was unconstitutional as it applied to Range. *Id.* at 106. In reaching this decision, the Third Circuit interpreted *Bruen's* historical framework as requiring two steps:

> After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct. If it does, the government now bears the burden of proof: it "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

*Id.* at 101 (quoting *Bruen*, 142 S. Ct. at 2127).

Under the first step of the *Bruen* framework, the Third Circuit found that Range was one of "the people" protected by the Second Amendment and that his request "to possess a rifle to hunt and a shotgun to defend himself at home," was protected Second Amendment conduct. *Id.* at 100. The Third Circuit then examined whether the Government met its burden to demonstrate that stripping firearms from one convicted of Range's prior felony is consistent with the Nation's historical tradition of firearm regulation and concluded that it did not. *Id.* at 103. According to the Third Circuit, the Government failed to show that "our Republic has a longstanding history and tradition of depriving people *like Range* of their firearms." *Id.* at 106 (emphasis added). Thus, the Court held that § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights. *Id.* The Third Circuit noted, however, that its decision was a "narrow one" that found only that § 922(g)(1) was unconstitutional as to Range. Judge Ambro's concurrence emphasized this point and added that *Range* "does not spell doom for § 922(g)(1)[] [which] remains 'presumptively lawful.'" *Id.* at 110.

## III.    DISCUSSION

Defendant argues that, following *Bruen* and *Range*, § 922(g)(1) is unconstitutional both on its face and as it applies to him. D.I. 29 at 1. Because Defendant lacks standing to challenge the constitutionality of § 922(g)(1) under the Second Amendment, his Motion fails. Further, even if standing was proper, the Government has carried its burden of showing that § 922(g)(1) is

constitutional as it applies to Defendant, and Defendant has not proven that the statute is facially invalid. Thus, Defendant's Motion to Dismiss is DENIED.[1]

### A. Defendant lacks standing to challenge the constitutionality of § 922(g)(1).

Defendant contends that "the indictment in this case must [] be dismissed unless the government can carry its burden of showing a sufficient historical tradition of permanently disarming people like Mr. Cooper." D.I. 29 at 19. Yet to raise this argument, Defendant must have standing to challenge the constitutionality of § 922(g)(1) under the Second Amendment. In other words, Defendant must satisfy the threshold requirements of Article III. "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007). To exercise Article III standing, Defendant must prove that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Defendant has the burden of establishing each element. *Id.*

"The second element, causation, demands a causal connection between the injury and the conduct complained of that is attributable to the defendant, and not the result of the independent action of some third party *not before the court*." *Siegel v. U.S. Dept. of Treas.*, 304 F. Supp. 3d 45, 50 (D.D.C. 2018) (emphasis added). Thus, where "a party's constitutional rights are already limited by the acts of a third party not before the court, the party cannot make the required showing of causation." *United States v. Terry*, Nos. 2:20-cr-43, 2:22-cr-178, 2023 WL 6049551, at *3

---

[1] As a preliminary matter, Defendant's Motion to Dismiss asks the Court to dismiss the Indictment in its entirety. Because Defendant's arguments are addressed to the indicted § 922(g)(1) charge, the Court agrees with the Government that Defendant's Motion seeks only to dismiss the pending § 922(g)(1) charge. D.I. 32 at 6.

(W.D. Pa. Sept. 14, 2023). The third element, redressability, requires that it is likely "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).

As Defendant was already subject to the terms of state probation at the time of his gun possession, he cannot meet the causation element of Article III standing. "Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001) (internal quotation marks omitted); *United States v. Rahimi*, 61 F.4th 443, 464 (5th Cir. Mar. 2, 2023) (Ho, J., concurring) ("Arrest and incarceration naturally entail the loss of a wide range of liberties—including the loss of access to weapons."). In fact, "[p]robationers' liberties are restricted in areas from search-and-seizure protections to associational rights to bodily autonomy." *United States v. Krauss*, No. CR 23-34 (JEB), 2023 WL 7407302, at \*4 (D.D.C. Nov. 9, 2023). Defendant, under the terms of his supervised release with the State of Delaware, forfeited his right to possess a firearm. As such, any limitations on his Second Amendment rights resulted from his status as a parolee and were proximately caused by parties not currently before this Court, including the Delaware parole board.

Similarly, due to his probationary status, Defendant cannot show that his injury is redressable. The injury that Defendant alleges was suffered—deprivation of his right to possess a firearm—would not be cured by a favorable decision from this Court, as Defendant was deprived of his Second Amendment protections under the terms of his probation. *See* D.I. 29 at 3 (noting that Defendant "faces years in federal prison for doing exactly what the Second Amendment grants him the right to do: possess a firearm"). Therefore, to redress his alleged injury and restore his right to possess firearms, Defendant "would likely have to first seek a declaration that [his] state

8

sentence[] deprived [him] of [his] Second Amendment rights." *Terry*, 2023 WL 6049551, at \*3. Accordingly, the redressability element of Section III standing is not met.

Because Defendant cannot show that his injuries were caused by § 922(g)(1) and cannot prove redressability, the Court finds that he lacks standing to challenge the constitutionality of the statute under the Second Amendment.

### B. Alternatively, the Government has met its burden to prove that § 922(g)(1) is constitutional as applied to Defendant.

In determining whether § 922(g)(1) is constitutional as it applies to Defendant, *Bruen* and *Range* instruct the Court to "first decide whether the text of the Second Amendment applies to a person *and his proposed conduct*." *Range*, 69 F.4that 101. If the Defendant can show that he is a "person" protected under the Second Amendment and that his conduct is protected conduct, the burden shifts to the government to "prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *Id.* (citing *Bruen*, 142 S. Ct. at 2127).

Defendant argues that, like the party in *Range*, he is a "person" protected under the Second Amendment "[d]espite his criminal history." D.I. 29 at 9. The Government and this Court agree.[2] D.I. 32 at 18. Yet, *Bruen* also requires Defendant to show that he is engaged in conduct that the Second Amendment protects. *See Range*, 69 F.4th at 101. In support of his Motion, Defendant contends that his "alleged conduct" is "possessing a firearm." D.I. 29 at 11. However, the Supreme Court has long explained that "the [Second Amendment] right was not a right to keep

---

[2] *Range* holds that a "the people," as used throughout the Constitution, "unambiguously refers to all members of the political community, not an unspecified subset." *Range*, 69 F.4th at 101. Thus, Defendant is a "person" for purposes of the Second Amendment.

and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 142 S. Ct. at 2128. Rather, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. In *Bruen*, the Court held that "individual self-defense is 'the central component' of the Second Amendment right," thus possessing a firearm for self-defense was a protected activity. *Bruen*, 142 S. Ct. at 2118 (citing *McDonald*, 561 U.S. at 767). Similarly, in *Range* the Third Circuit found that the question of whether Range was engaged in "protected" conduct was easily answered where he sought "a rifle to hunt and a shotgun to defend himself at home." *Range*, 69 F.4that 103. These statements indicate that the Court must consider Defendant's conduct beyond his claim that the Second Amendment merely applies to his possession of a firearm. Because such information is not before this Court at this stage, the Court cannot determine whether Defendant was engaged in protected activities.

Even assuming that Defendant did engage in protected Second Amendment conduct, the Court still finds that § 922(g)(1) is constitutional as it applies to Defendant. Defendant, relying on the Third Circuit's holding in *Range*, argues that restricting his right to bear arms is inconsistent with historical firearm restrictions, which were "not about felons in particular or even criminals in general" but were rather "about threatened violence and the risk of public injury." D.I. 29 at 19-20. According to Defendant, despite "historical support for disarming someone with a demonstrably violent criminal history," he, like Range, "has not been convicted of any violent offenses."[3] *Id.* Yet, this matter is highly distinguishable from *Range*. Range, unlike Defendant,

---

[3]In making this argument, Defendant mischaracterizes the history of firearm regulation. The linchpin of the analysis is not whether a past crime was violent, but whether the defendant's possession of guns is dangerous or perpetrates public disorder. *See Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) ("The historical evidence does, however, support a

was convicted of a misdemeanor of making a false statement to obtain food stamps. *Range*, 69 F.4th at 98. Further, unlike Defendant, Range successfully completed his probationary sentence "without incident" and committed no other crimes for over 28 years. *Id.* The Third Circuit clarified that its decision in *Range* was "a narrow one" in which the court found no history or tradition supported "depriving people *like Range* of their firearms." *Id.* at 106 (emphasis added).

Defendant, on the other hand, is charged with possessing a firearm while on state probation and in violation of the terms of his probation. Also, Defendant has prior convictions for Drug Dealing under 16 Del. C. § 4754, Drug Dealing Heroin under 16 Del. C. § 4754, Possession of Heroin, Aggravated Possession of Heroin, and Resisting Arrest. As the Government highlights, his disqualifying felony convictions concerned the dealing of heroin, a drug known to cause overdose and death, and included a recent conviction in 2021. D.I. 32 at 5. While '[i]llegal drug trafficking is a largely modern crime' with no direct historical analogue," *United States v. Reichenbach*, No. 4:22-CR-00057, 2023 WL 5916467, at *6 (M.D. Pa. Sept. 11, 2023), the Government identifies historical traditions that deprived Second Amendment rights from those who were dangerous and posed a threat to public safety, regardless of whether their crimes were inherently violent. D.I. 32 at 13-16. For instance, the Government cites restrictions from as early as the 17th century which sought to disarm those who threatened public safety and disturbed the orderly function of society. *Id.* at 13 (citing a "17th century statute empowered the government to 'seize all arms in the custody or possession of any person' who was 'judge[d] dangerous to the Peace of the Kingdom'"), *id.* at 15 (highlighting 19th century laws requiring "'those threatening

---

different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence *or whose possession of guns would otherwise threaten public safety.*") (emphasis added).

to do harm' to 'post bond before carrying weapons in public'"), *id.* at 16 (citing an 1866 order restricting "disorderly [], vagrant, or disturber[s] of the peace" from bearing arms).

While the Court need not rule on this issue to resolve Defendant's Motion,[4] the Court agrees with the Government that the disarming of individuals who pose a danger to society is deeply rooted in our country's legal traditions. *See* D.I. 32 at 13. To determine whether § 922(g)(1) is in line with this historic tradition, *Bruen* mandates that the Court determine whether the historical regulation and the modern-day regulation are "relevantly similar under the Second Amendment." *Bruen*, 142 S. Ct. at 2132. Under *Bruen*, two metrics are relevant to this analysis: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Applying this standard, the Court finds that the Government has raised proper historical analogues to § 922(g)(1).

First, like the historical traditions identified by the Government, the "why" behind § 922(g)(1)'s firearm prohibition to individuals with a history of drug trafficking is clear: the goal is to protect the public from disruptive and dangerous conduct. While Defendant's qualifying crimes were not themselves violent, they were indisputably dangerous as there can be no doubt that the dealing of drugs poses a clear societal threat. *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting) ("Disarming burglars and drug dealers makes sense because their past crimes were inherently dangerous."), *abrogated by Range*, 69 F.4th 96. Furthermore, guns and drugs "are a dangerous combination" that exacerbate the risk of violence when used together. *See United States v. Jones*, 900 F.3d 440, 449 (7th Cir. 2018) ("[G]iven the dangers of drug trafficking, guns and drugs often go hand in hand."); *United States v. Clinton*, 825

---

[4] As noted above, Defendant lacks standing to challenge § 922(g)(1) under the Second Amendment. *See supra* III(a).

F.3d 809, 812 (7th Cir. 2016) (noting that where "a firearm is found in close proximity to the drugs or its paraphernalia, the conclusion that the firearm is connected to that drug activity is a reasonable one in light of the common use for that purpose."). Disarming a person who violates state and federal drug laws "fits well within the historical disarmament of those who pose a threat to public safety." *Id.* at 24; *See also Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) ("The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety."); *see also United States v. Yancey*, 621 F.3d 681, 686-687 (7th Cir. 2010) (citing *United States v. Jackson*, 555 F.3d 635, 636 (7th Cir. 2009)) (recognizing the "connection between drug use and violent crime" and explaining that "there is no constitutional problem with separating guns and drugs.") This is especially true where, as here, Defendant's drug-related convictions were recent.

As to "how" § 922(g)(1) burdens Second Amendment rights, § 922(g)(1) prohibits individuals, like Defendant, who have been convicted of felony drug trafficking offenses from possessing firearms. The same is true with the Government's referenced analogues, which restricted individuals deemed to be dangerous and disruptive to society from possessing a firearm. D.I. 32 at 24 ("'Legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1).'") (citing *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. June 2, 2023)). Thus, the Government has identified historical analogues that are relevantly similar to § 922(g)(1), and the Court finds that § 922(g)(1), as applied to an individual like Defendant who has been convicted

of recent felony drug trafficking offenses, "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

   C. *Defendant has not shown that § 922(g)(1) is unconstitutional on its face.*

  Finally, Defendant's facial challenge to the validity of § 922(g)(1) is unfounded. To succeed on a facial challenge, Defendant "must establish that no set of circumstances exists under which the [§ 922(g)(1)] would be valid." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011). Yet, as even Defendant concedes, there is historical support for disarming someone with a demonstrably violent criminal history. D.I. 29 at 19-20. Further, in both *Heller* and *McDonald*, the Supreme Court recognized the "longstanding prohibitions on the possession of firearms by felons," which the Court noted was "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26; *McDonald*, 561 U.S. at 786. As neither *Bruen* nor *Range* invalidate, alter, or overturn the legal principles and analysis set forth in *Heller* and *McDonald*,[5] these holdings stand. Thus, Defendant cannot prove that § 922(g)(1) is unconstitutional in all of its applications, and his facial challenge to § 922(g)(1) fails.

## IV. CONCLUSION

  For the foregoing reasons, Defendant's Motion to Dismiss is DENIED. The Court will issue an Order consistent with this Memorandum Opinion.

---

[5] *See e.g.*, *Bruen*, 142 S. Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *id.* at 2132-2133 ("*Heller* and *McDonald* point toward at least two metrics [to assess whether a historical regulation is a proper analogue for a modern firearm regulation]: how and why the regulations burden a law-abiding citizen's right to armed self-defense.").